Go to the next case, which is Johnson v. Folino. Mr. Zuckerman, give them a minute to settle themselves. We should already have some time on the clock. Okay, Mr. Zuckerman. If I may, if it pleases the Court, my name is David Zuckerman. I represent Appellant Roderick Johnson. With Court permission, I'd like to reserve two minutes for rebuttal. Granted. In a pretrial hearing in this case, defense counsel stood up and made a discovery request. We are asking for all police reports that evidence the police investigation of Mr. George Robles. This was essential to the defense theory that Mr. Robles was a liar and a fraud, that he had something to gain from his testimony, from his cooperation. The district attorney stood up and flatly denied such investigations and or reports existed. In fact, in closing argument, urged the jury to reject this line of cross-examination because there was no substance to it, there was no factual predicate for it, when in fact there were numerous reports and numerous indications that this gentleman had been under a police investigation for some time, and importantly, that he was aware of it. In each of these, he was consulted by the police about these allegations, so he was aware that he was under investigation. What is the Brady material? What should have been turned over at that point that wasn't? The police reports? Yes, the police reports. There were five incidents, all felonies, where Mr. Robles was investigated and labeled as a suspect in these crimes and consulted and investigated, so he was aware he was a suspect. So, yes, those police reports should have been turned over. If there had been no reports, then even then the Commonwealth would have been obliged to say, hey, we had this gentleman under investigation. When he comes before you and says he has no interest other than being a good citizen, that may be wrong. He does have an interest in parlaying his cooperation into favorable treatment, but certainly these police reports had to be disclosed. All right, the police reports. How about the report regarding the cigar box and the fingerprints? Absolutely, because, again, he's under investigation. We know that for a couple reasons. They fingerprinted him. They didn't go to a bank of fingerprints. They said, will you come down and be fingerprinted? Will you come down and let us photograph your tattoo, which indicated a gang affiliation? He is labeled in that document, the positive fingerprint report, as a suspect. So he's implicated in a seizure, a major seizure, of over 30 grams. What's the gang affiliation? It's nightlife clique. He was extensively cross-examined at trial, whether he was in a gang. The defense lawyer repeatedly referred to the nightlife clique as a gang, and Robles consistently denied that. That's correct. So what admissible evidence is in this record to the contrary? There was a major drug seizure which involved a number of people, for example. There were two people that ran the drug house. But what's significant is not whether it's a gang. Let me ask the question again, because this question for me is supremely important. What admissible evidence is there in this record? You did a fabulous job in discovery once you got access to discover documents. What is in this record that would be admissible evidence to disprove Robles' statements at trial that nightlife clique is not a gang and that he's not a major drug dealer? The major drug seizure. And that evidence that there were a number of people involved, that he had this organization where some people would keep the drugs in a separate location. He would pay them to maintain these drugs. You don't want to characterize it as a gang. Where is that in the appendix, the report of that? Is that a police report? Yes, these are police reports. I can give you the precise site if that's helpful. Was it attached to one of the third, fourth, or fifth petitions? It was attached to the petitions, and it's in the appendix. And I can refer you to the paid sites. It starts at about 1577, and it's the account of ‑‑ and here's the chronology. They arrest a juvenile who resided in Mr. Robles' house. They went to a neighboring house. They said, we understand an individual brought drugs to this house. Those individuals admitted keeping Mr. Robles' drugs for him. It was a stash house. They turned over the bag that had been delivered there, and that's the bag that had Mr. Robles' fingerprints. So you have two witnesses say, we were paid to hold his drugs. They found the drugs in three cigar boxes, and Mr. Robles' fingerprints are on one of the cigar boxes. That is evidence of a conspiracy, whether we want to call it a gang or not. There was a group of individuals involved in this. Well, what's crucial is that they went to Mr. Robles and said, we're asking you about this, so he knows he's under investigation for that crime. He appears to have deftly alluded prosecution and conviction. I mean, if you were the defense lawyer, you'd be jumping up and down, objecting to the admissibility of this evidence, saying, well, so his fingerprint's on a cigar box, so what? That doesn't mean he held the cigar box when it contained the crack cocaine. Maybe he held the cigar box when it contained cigars. Who knows? I mean, if the question is posed generally, does this guy look like he's dirty and perhaps is some guy who comes down from New York to Reading, Pennsylvania, to establish himself as a drug kingpin, sure. But you need to show us admissible evidence that could have been put forward into court in the trial of Mr. Johnson. Well, let me preface it this way. What is that admissible evidence? Is it a document? Is it testimony? What is it? It can't be some sort of general sense that there was a big seizure and we all really are pretty confident that it was George Robles running the show here. That's not admissible. Let me preface it this way. For Brady, it can be impeachment evidence. This was largely impeachment evidence. So when Mr. Robles is asked, and specifically asked by counsel, aren't you expecting something? Aren't you expecting the police overlook your crimes in exchange for your cooperation, which he denied? So on cross-examination you can say, Mr. Robles, did Agent Cabrero come to you and investigate and ask you about this drug seizure? Did Agent Cabrero come to you and show you that there was evidence against you for these multiple aggravated assaults? Now, if Mr. Robles denies it, which he did at trial, he denied any knowledge of this investigation, then you can confront him with the police reports or call the detective to say, yes, he was under investigation and he knew it because we went to ask him about it. He denied these crimes. That's what's the critical impeachment in this case, is did Mr. Robles have something to gain? In his mind, he knew he was under investigation. When defense counsel stood up and made this request, the district attorney didn't say, well, this wasn't admissible, that it's too far afield. They stood up and said, these reports don't exist. And the best measure of its admissibility, Judge Hardiman, is that this line of questioning was admitted at trial. He was asked about gangs. He was asked about drugs. He was asked about guns. No, that's my point. That's my point is if there was something in this appendix, and I haven't seen it yet, but please point me to it. If there's something in this appendix that indicates that, in fact, Robles was in a gang, Robles was a drug dealer, et cetera, et cetera, then you've got a different trial. But what I'm seeing in the appendix is more of the same. It's Robles saying, I've never been arrested. True. I've never been convicted. True. I've talked to Cabrera hundreds of times. I'm always around when crime happens. I'm the guy to see. I'm the Gambino. I smoke weed. He's admitted to drug use. He's admitted to all kinds of illicit behavior. But what I don't see in the appendix through all of the federal discovery is that, in fact, he's a drug dealer. In fact, he's in a gang. It's all supposition. And that supposition I don't, you know, I have my trial lawyer, trial judge hat on here. I'm having trouble seeing how that supposition gets admitted into the trial if it had been possessed. If I may, if I may, let's look at state law on this. And let me just read one sentence from a leading case. A defendant has the right to impeach by showing bias to challenge a witness's self-interest by questioning about possible or actual favored treatment by the prosecuting authority. And the operative word there is possible. This comes from Commonwealth v. Evans. And it's a definitive statement of the admissibility of this type of impeachment. We also know from. Well, let's assume it was admissible. I'm all the way kind of at the end of the chart with the cause and prejudice because we haven't talked at all about the procedural and I have a couple of questions on that. But when we get to cause and prejudice, let's assume there are ten police reports that should have been disclosed. On the other hand, in the third, fourth, and fifth petition, there are lots of affidavits from people and investigators that presumably could have been discovered separate and apart from these police reports. Don't we look at that evidence and say it wasn't necessarily the Brady material. It was that they never called these people. And some of the affiants say, I told them I was ready to testify and they never called me. And these affiants are saying he deals drugs, he does this, he's in with the police, these two cops are dirty. I mean, there's lots of evidence that wasn't brought in of the same type. So don't we, in looking at cause and prejudice, have to weigh how much the Brady, qua Brady material, what role that really played as compared to, you know, it didn't bring in anything to rebut his statement. No, no, no, I'm, you know, I'm a choir boy, I'm this. Well, he wasn't made out to be a choir boy, he was made out to be a bad guy, but they couldn't prove it. But there were affidavits of people. Let me make the crucial distinction. There were plenty of affidavits. It was fairly commonly known that Mr. Robles was a drug dealer. But the crucial distinction is that the police. Wait a minute, stop there, stop there. It was common knowledge that Robles was a drug dealer? Yes. And yet the Commonwealth stood up and said no, we have no such evidence? That's correct. Even in their police reports he's labeled as a known drug dealer. That's in the affidavits. But he was never convicted of it. He was never convicted prior to trial. But let me turn to the key distinction, and this is it. It's not that Mr. Robles was a drug dealer. It's not that he's a violent man who shoots his gun off at people. It's that he knew he was under investigation for these crimes. That's what gives him the motivation, and that's the key distinction. All of those affidavits just show that he's an individual who has a reputation as a drug dealer, and the police should have known. When we got those police reports, that was confirmation. Again, it was suppressed. We asked for those at trial. The district attorney flat out denied they existed. That's confirmation of the key thing that was missing from the affidavits, and that's did Mr. Robles know he was under investigation? Did he have a reason to try to parlay his cooperation into some kind of leniency? Was he formally under investigation or just somebody that they suspected was dirty? In each of these reports, and we've produced five of them, there were witnesses that accused him by name of committing serious felonies, and or in the drug investigation, they actually found the drugs. So in each of these, he's legitimately a suspect. He's labeled as a suspect. In all of them, it's clear he's a suspect. Twice or three times do they actually refer to him as a suspect. They use the word. In every one of these instances, he clearly is a suspect, and that's what's key to the Brady violation. It gives force to the defense theory. The defense theory, again, was that this fellow Robles was a fraud and a liar, and he has reason to fabricate his account. In fact, he stood up and said, I'm motivated by a guilty conscience. I'm just trying to do the right thing, and consistently denied he had any motivation other than to be a good citizen, and that's the way the prosecution portrayed him. And in summation, they said reject that line of impeachment because there's no foundation for it. When they knew in their files there was every reason for Mr. Robles to fabricate his account. Would you address the Luz Citron situation that she said there was police coercion? Now there is no record that shows anything of that. What's Brady about that? I would suggest this, that there is an affidavit from an investigator that Luz Citron said she was threatened, but that's not key to what we're hearing today. There was no hearing below. That has not been fleshed out. What's key about Luz Citron are a few things. One, she cohabitated the very same residence where Mr. Robles was selling drugs. In the police report, again, undisclosed, was an incident where the – he was a girlfriend, common-law wife, fiance. The police went looking for Mr. Robles. Where's Mr. Robles? She lied to the police about his whereabouts. It shows us a couple things. One, she's willing to lie to the police. Two, it shows us that she's in cahoots with Mr. Robles. So I suggest on this question of prejudice and materiality that the jury was well within their rights to be completely skeptical of anything Ms. Citron said. The last witness in the case is – was Milta Velazquez, whose entire account, even the prosecution did not have much faith in her. Her entire account at trial was three pages. She overheard one remark when the TV was on. That was all she could testify to. There's no question that – She suddenly saw a gun that she had never seen before. That's correct. There's no question that the undisclosed impeachment material in this case undermined the confidence in Ms. Curran. The case rested on Mr. Robles. The defense was denied key impeachment material to expose him for what he is. If we were to – I'm sorry. Go ahead. The district court did not do an explicit cumulative prejudice analysis. That's correct. Is that right? That's correct. To be honest – Did you ask for that? Yes. And to be honest, Judge Rubino seemingly agreed that this was material evidence. Yet, I guess in his mind he used the term speculative. I suggest there's nothing speculative about these reports. They had real-life witnesses, real-life forensic evidence, fingerprints, drug testing. He was a suspect in these cases. Yeah, of course, he said it was a story in a story, you know, it would lead to – and there is something to that, too, when you look at these reports. They're all about incidents that just aren't relevant here. Are we – if we were to find cause and prejudice at that level, what is our role as a court? Well, I think there's – In terms of the standard of review, the deference, the AEDPA applicability, et cetera. This court's standard of review is plenary. We should decide this de novo because there was default in the state court. The state court – the operative opinion here is really the 2009 Superior Court opinion because the bulk of the evidence, 99 percent of the evidence, fell under that second opinion. They explicitly say this is untimely. We are not addressing the merits. Second opinion, that on the third petition? It would be, I believe, the third, fourth, and fifth petitions all funneled into – Right. The fact that the second petition was arguably on the merits doesn't matter. We look at the third, fourth, fifth where it was strictly procedural. Now I'm at the beginning of the analysis procedure of default. I suggest also in that case they specifically found default. But even if that was a merits decision, they appeared to turn on whether or not we were diligent in uncovering this. But I just refer the court to Banksy-Dredke, which says once the Commonwealth stands up and says, this evidence does not exist, that we satisfy Brady, that prong of Brady. So even if it were a decision on the merits, it's clearly contrary to Banks because Banks specifically says, once they stand up and deny it exists, you don't have to go search anymore. And that's the situation in this case. Okay, we'll hear from the – I guess it's the Commonwealth. Not the feds, the Commonwealth. District attorneys. Yeah, well, that's the Commonwealth. Good morning, and may it please the Court. I'm Andrea McKenna. I'm a senior deputy attorney general from the Pennsylvania Attorney General's Office. For the respondents. Ms. McKenna, didn't your representative clearly misstate to the court when he stated that we have no such – there is no such evidence. We don't have it. CCA, from what we know, that's clearly wrong. I mean, how can you do that? I don't respect the state. I think I can answer this question ultimately, and this is what I want to start with. No, start with my question. Well, this was not a drug case. The materials that have been labeled Brady during this habeas process,  this court, sitting obviously in federal habeas, reviewing a state court determination, would have to say that Brady requires the Commonwealth not just to turn over reports that were made in connection with the murder investigation, but to scour the entire universe of Redding police reports, maybe Berks County police reports, or maybe national police reports. I don't know. Nonsense. How many police officers are there in Redding? And look for – excuse me, I don't know, Your Honor, but what I'm saying is the obligation that Johnson would have this court impose is an obligation to scour police reports, look for reports that just mention the name of a Commonwealth witness and turn those over into Brady. Well, that would be one thing if the representation was, we've looked at the conviction records, and he's never convicted of anything. And that was true. But, Your Honor, we really can't scour the records. No, the representation was, we have nothing, because what was requested was arrests, et cetera, et cetera, and the representation was made. Nothing. I think if you look at the reports, that existed prior to the time of trial, at the time of trial. George Robles was not convicted of anything. He hadn't been arrested. He hadn't been charged. Now, there was one incident report where it appears that he assaulted a person on the street. And as I stand here, the date of that escapes me. That never went forward because the victims or purported victims refused to cooperate in the investigation, and the police withdrew it. So, yes, there are police reports that say things like, there were shots fired at a house where George Robles lived. And we saw him, when the police came to that scene, we noticed that he was standing on the street corner. In my understanding of Brady and everything that has passed Brady, that isn't Brady material. Do you argue that to the district court? Do you argue to the district court that this is all about nothing, that it really isn't, there's no Brady material here? I did argue that. It's impeachment. I mean, it's not just exculpatory, right? Isn't impeachment material Brady material? Anything that the defense can use. Impeachment material is Brady. But here is another point that I think is absolutely crucial to bearing this in mind. When the federal defenders filed their second PCRA petition, which was untimely, the facts that they asserted as suppressed Brady information were the things that you, Judge Hardiman, referenced during opposing counsel's argument, that Robles was a member of this nightlife clique, that he had a tattoo, that his name was Gambino, that the police came to him for information, because in his estimation he was so important and knew everything that was going on. All of this information, number one, came out uncrossed. And number two... Well, what is that? Wait a minute. It's not quite there. Say what? If all of this information... It's not Brady because it came out uncrossed? It wasn't suppressed. It was used at trial. And my further point is... You mean the defense should have been on notice that there might be something there? Is that the argument? This is why the defense knew perfectly well what George Robles was and what he was up to. He and Johnson were friends. They weren't two people who just passed each other in the dark of night on a street and happened to get caught up in the same crime. These people were friends. Who did Johnson go to after he shot Jose Martinez? He went to Robles' house. But Johnson may not have known some of the specifics that were later discovered through the federal discovery process. Johnson may not have known that there were police reports naming Robles twice as a suspect. And that word was used twice, I believe. I think that's... You know, I have to stand here and say that I do recall one police report that denominates him as a suspect. And there again, uncharged criminal conduct is not impeachment evidence. Now, yes, possibly... Isn't it evidence that could be used by the defense? I mean, isn't that the whole point of Brady? If it was impeachment information, which the defense... If it was information that the defense would have used to go on with its discovery. To go on with discovery or to go on with impeachment, obviously, yes. My point is Johnson and Robles were not strangers to each other. I would submit that Johnson... Right. Johnson knew Robles, what he was all about in every way, shape, or form. He's wearing his clothes. He's staying at his place. They were, quote, best friends. I understand that. But isn't it true that some of the evidence discovered through the federal process was information that Johnson would not have known? Because it was information to which only the police were privy. Johnson may not have known that Robles, who was an admitted cigar smoker, that his fingerprint was on a cigar box. But is that impeachment evidence? Well, yeah. The fact that Johnson knew what Robles was like is why the cross-examination proceeded the way it did. But the problem was you couldn't catch Robles in the lies, because if he denies all these things, then it's so what until you say, and weren't your fingerprints found on the cigar box, but there were 140 packets of crack, and, you know, weren't you, and Mr. Robles, you say this, but isn't it true that? I mean, you can then catch him in his lies, whereas during the trial, Robles could just keep denying as long as he wanted to. I think if you read the trial testimony of Robles, he's a guy who was pretty full of himself. You get a pretty good idea of what he was like and what the jury might have made of him. Yeah, but the prosecution in the closing can then get up and say, you know, they say he's a drug dealer. Where's the evidence? Show me. You know, you can say a lot of things, but you can't prove it. Well, maybe this would give it. And is his being a drug dealer, does that disqualify his testimony as to what Johnson told him? Well, there's the involvement with the police. Now, there was cross-examination on the Cabrera letter, the letter he wrote to Cabrera. Is that correct or not? Well, and there's, you know, part and parcel of the argument here is that Robles was a drug dealer. Maybe he even dealt drugs with the police, and in order to protect his alleged drug dealing and the corrupt police, he basically was a Commonwealth puppet and testified to what the Commonwealth wanted him to say. That ignores the rather inconvenient fact that when the day came for the preliminary hearing of Johnson, Robles was nowhere to be found, and the Commonwealth had to go out, arrest him, and hold him as a material witness. So that tends to speak against the fact that he was this willing police tool. But wait a minute. If Johnson's supposedly a hit man, and he comes in and he testifies against Johnson, maybe he's finally had a reverse pang of conscience here. He doesn't want any parts of this. Isn't he under sentencing? Pardon? Isn't he Johnson? Yeah, he is. I mean, you're ascribing a certain motivation for him not showing up. I don't know whether that works. Do you agree that if we get to cause and prejudice, that our review is plenary? I believe it is. I believe it is. I guess I'm a little surprised by your argument because I thought you were going to argue that this was Brady material, concede it was Brady material, and it could have, in theory, been helpful to the defense, but where's the beef? This business about him being a drug kingpin, et cetera, et cetera, is any of that admissible? I thought that was the crux of your argument. In my brief, I had made that argument because every one of these reports would have come up seriatim, and every one of them would have been subject to objection by the Commonwealth. Basically, what I'm saying is none of this is material on grounds of relevance, primarily, because I do think that it is not reasonable to believe that a trial court judge sitting in a murder trial would have permitted his control of the murder trial to extend into an investigation of drug dealing and or police corruption. Absolutely, the judge would have allowed any inquiry into whether Robles had skin in the game. I mean, as I understand the other side's argument, the picture there, and this was written about ad nauseum by the state court, that Robles had skin in the game. Robles was under scrutiny, under investigation, in trouble, and if he didn't play ball in the Johnson case, he was going to be in that, quote, nice seat that he referred to at trial. I mean, that's the theory, and that's fair game. All that's coming in, right? Because that goes to whether he's telling the truth or not. That's the defender's theory. I don't know that that was anyone's theory prior to the second PCRA being filed. Well, I mean, the trial transcript, that comes out in spades. Mr. Bispol, I mean, constantly was saying, you know, you're a gang member, you're the real criminal here, and there were allusions to Cabrera, despite counsel's statements prioritio that, you know, I would not throw any mud on Agent Cabrera, there was all kinds of innuendo that Cabrera was dirty. That if it did come up at trial, and it did, because obviously, I mean, there was that statement pre-trial that, you know, we think Robles is corrupt. If it did come up at trial, and it did, then where is the prejudice? Well, but it allows the defense, when he's denying, saying, isn't it true that, da-da-da-da-da-da, isn't it true that, and you don't even need to, you don't introduce police reports, you can just come back to him with, you know, with his denials, but isn't it true that your fingerprints were, isn't it true that, and that whole line of, was denied. Isn't it true that you, Mr. Robles, a cigar smoker, had a fingerprint found on a cigar box? I don't see the relevance, and I don't know that a trial court judge would have seen the relevance. Or isn't it true that shots were fired at a house that you live in? Or isn't it true that the police always seem to see you hanging around? And return your safe, return your safe, and a lot of other little things. The district attorney represented to the court that Robles has no, this is from the appendix, has no criminal record, and further, that there are no reports in the possession of Bennett or the Reading Bureau of Police which name George Robles as a suspect. In fact, there were police reports naming Robles as a suspect, and at least one of which named the police officer, Chavez, who was present at the pre-trial hearing as involved in the investigation. Isn't the defense entitled to that? They may have been, but I have to say that I don't believe that that in itself would render this verdict, would remove all confidence in this verdict. Undermine the confidence in the verdict. I was trying to find the phraseology. The difficulty is we don't have any physical evidence. We have two people who came in touch with the shooter, one of whom knew Johnson, who did not make positive identifications. We have three witnesses, each of whom we now know may not be telling the truth. Well, if the court, and I see my time is up, but I just want to say. That's all right. You're on our time now. Don't worry about it. Thank you. All right. Thank you. I want to speak to Judge Mandel's question and the inference it makes to these affidavits. These affidavits were made years, maybe decades after the events occurred. They were made by the defenders, transcribed by the defenders. They've never been subject to any kind of scrutiny, cross-examination, and so forth. Ms. Velazquez, so we can't take them as reliable. And I would say that Ms. Velazquez. Wait a minute. You're saying that the defenders put up unreliable affidavits? I'm not sure where you're going with this. I'm saying that they were prepared by the defenders, transcribed by the defenders, and that this panel should not take them as absolute truth in that they are untested. But I want to finally say this. Malta Velazquez was at the time Johnson's girlfriend. Her testimony and a young woman. So she, like many people questioned by the police, may have felt pressure, coercion, whatever. But her testimony was she and Johnson were watching the local news. The news of the Martinez murder came on the screen, and he said, they're talking about me. I killed him. I'm a hit man. That's what I do. So there is, I believe, credible evidence. There's the evidence which the district court called overwhelming commonwealth evidence. But didn't she say that she had never seen a gun, that he told her he had a gun? And then later on the stand, the first time ever, she says, oh, yeah, I've seen his gun. I mean, there were some inconsistencies, and then I think Cintron had the order of people reversed. I mean, there was a lot of. Cintron had, I believe she's the person who, when the police were looking for Robles, originally said he's in New York, and he, in fact, was somewhere else, and she knew that was the case. Okay, thank you. Thank you. Very briefly, let me point out why it mattered in this case, and hopefully allay some of the reservations of the commonwealth. There was no scientific evidence in this case. There was no identification evidence in this case. The jury was out for nine and a half hours. At one point it reported that they were dead. Well, we don't know what that means. It was a closed case. That's my only point. I'll make myself available. They've been having a long lunch. I mean, nine and a half hours to me does not mean. I don't have nine and a half hours. They did report. They did report. It was a three-hour lunch and only six hours of deliberation. They did report at one point they were deadlocked. I think that does matter. And I'll make myself available to any questions for the court. I'd like to follow up on Judge Rendell's questioning of your opposing counsel. The isn't it true that line, I think that, to me at least, is very important. Play defense lawyer. Turn back the clock. You're representing Mr. Johnson at trial. You've got Robles on the stand, and unlike poor Mr. Bispell, if I'm remembering his name correctly, now you are armed with all kinds of information that he didn't have. Okay. What question are you going to ask Robles? What question or questions do you want to ask Robles? If I may? I'm going to say the information is from the police reports, the clearly Brady hearing. Right. Mr. Robles, were you confronted by the police in February of 1996 regarding an aggravated assault? Were two witnesses accused you of pointing a gun and threatening their lives and saying, I know your family and where you live, and then shooting off the gun? Mr. Robles at trial denied being involved in any criminal activity. Isn't it true that you were a suspect, that Agent Cabrera came and asked you about that? If he denies it. Robles says no, and then what are you going to do? Show him a police report? We can show him a police report. I've never seen that. You're not going to get that in. Or worst case, we call Agent Cabrera, wasn't it true that you had two witnesses that identified him as the man with the gun and fired the gun? I'm not letting that in. Now you're trying a different case. Now you're going to try to impeach his credibility by trying him in some aggravated assault case. That's not going to happen. It would be admissible. That's a little prejudicial and extremist. It would certainly be admissible to show he's under investigation. That's the key to the case. Did Robles know he was being investigated? I guess what I'm wrestling with is how does he know he's under investigation? Don't you have to show almost that he was – Robles was privy to these documents that say he's a suspect? Not privy to the documents. You can ask him, isn't it true, Mr. Robles, you're trying to curry favor with the police? No. Well, isn't it true that you're under investigation for other crimes? No. Don't you then need to have some evidence to show that he's aware that he's under investigation? It's not enough to bring in something that only the police are privy to because then he looks at that and says, well, that's the first I've heard of that. Yes. And in each of these – That's all that's happening sidebar. In each of these instances, which we rely on, the police confronted him personally and told him he was under investigation and asked his account. And that's what's crucial. And there's one – in the very first one, there's, I think, one key fact, and I'll close with that, that he denied being the – pulling a gun on these individuals. But what he said to the police then was, while I'm here, let me give you some information on an unrelated case, a murder that occurred in New York. That's the Cintron case. And we know that after that, the police closed their investigation. They went on and investigated the Cintron case. But it's clear not only does he know he's under investigation, but he's got his first inkling that if I cooperate with the police, maybe they overlook my crimes. And that was the thrust of the defense. No one objected at trial to this line of questioning. It makes perfect sense to me, but I don't know how it's coming into evidence. I mean, you're painting – you've painted a great picture of a crooked guy and maybe, who knows, perhaps crooked police. But where – what evidence is coming in? Well, I think the best evidence, Your Honor, is that this line of questioning was admitted. The trial judge consistently, where there was objections and there weren't always objections, each time admitted. Then it's cumulative. To the extent he was impeached with, you're a bad guy, you smoke weed, you hang out all day, you're living off your poor girlfriend who works at Boscov's, you're playing video games, you go out at 1 in the morning to the Casablanca, on and on and on. I mean – The point is that – The only – I guess the only conclusion looking at the verdict is, you know, the jury could do nothing but conclude this guy is a really, really bad guy who happens to be telling the truth about some guy showing up at his house who used to be his best friend, out of breath, saying, I just killed somebody. I suggest that the only evidence of criminality that he admitted to was smoking pot. There's a big difference between smoking pot and being under investigation for five serious felonies, the knowledge of which he had. And I do suggest all this is admissible and was admitted by Judge Ludgate. She allowed that line of questioning and certainly had denied it. Where's the prejudice? Where's the prejudice? The prejudice because he was no – I think we're kind of agreeing, but we're kind of talking past each other. There is a mountain of cross-examination evidence to undermine Robles. Agree? I would not characterize it as a mountain. They tried to impeach him. Right. There's a lot of evidence to show that he's a bad guy, but you're saying there could have been more, there should have been more, and, again, what evidence is that extra that gets you the prejudice that you need in order for us to overturn this verdict? The theory of the defense was that Mr. Robles was not a good citizen. He's not coming forward because he was the town watch guy or doing the right thing, as he claimed at trial. Because he's playing games with the police. He had every reason to curry favor with the police because he was under suspicion for very serious crimes, crimes that would have, in the aggregate, could put him away for life. That's his motivation. I'm sorry we're taking you beyond your time. And those crimes were still pending? Those investigations were still pending, or were they in the past? They certainly, in his mind, were open. They were not beyond any kind of statute of limitations. He had no indication whether or not they were pursuing that or not. And we know from our federal cases these investigations often take months, if not years. Didn't the district court have an obligation to make an explicit – I asked this before, but I haven't – explicit cumulative prejudice analysis? Isn't that the law? That is the law, that under Brady there must be a cumulative analysis. We didn't see that at all from the state courts. We didn't see it from Judge Arena. And that's reversible error? The – yes, it's reversible error that the lower court denied the writ, yes. Well, of course, but the question is why did the district court deny the writ? And what you want us to say is that the district court made certain errors that require us – and it's a pretty big deal – to direct that the court – what do you want now? We're asking that the writ be granted and the relief be granted in the form of a new trial. I just remind the court your standard review is plenary. The district court seemed to believe this evidence was speculative. I strongly suggest that it's not speculative at all. It was in black and white in the hands of the police. They denied it. The prosecution denied it. It would have shown his motive to fabricate these reports or his accounts. And it's evidence that convicted Johnson, right? It was the evidence that convicted Johnson, yes. There was no scientific evidence. And we're talking about third, fourth, and fifth petitions. Correct. Thank you, Your Honors. Thank you. Thank you. We will take this matter under advisory.